# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| ROBERT BATES, | ) |
| | ) |
|     Plaintiff, | ) |
| v. | )    Case No. 3:18-cv-00467 |
| | )    Judge Aleta A. Trauger |
| COGNISENS ATHLETICS, INC., | ) |
| | ) |
|     Defendant. | ) |

## MEMORANDUM & ORDER

Pending before the court is a Motion to Dismiss pursuant to Rules 12(b)(2) and 12(b)(3) of the Federal Rules of Civil Procedure (Docket No. 7), filed by the defendant, CogniSens Athletics, Inc. ("CogniSens"), to which the plaintiff, Robert Bates, has filed a Response (Docket No. 12), and CogniSens has filed a Reply (Docket No. 17). For the reasons discussed herein, CogniSens' motion will be denied.

## BACKGROUND[1]

Bates is a resident of Rutherford, Tennessee. He has worked in the educational technology industry in Tennessee for approximately thirty years, primarily in sales. In the fall of 2012, Bates contacted a University of Montreal lab regarding research and news coverage detailing the lab's work with tools to detect and measure learning disabilities in school-age children. The lab put Bates in touch with Jean Castonguay, then the President and CEO of CogniSens.[2] CogniSens is a Canadian company located in Montreal, Quebec. Bates's interest in CogniSens centered on the company's core product, the NeuroTracker, a technology that Castonguay defines as "a 3D visual

---

[1] The facts are viewed in the light most favorable to the plaintiff.
[2] Castonguay's current position with CogniSens is Chief Officer for Strategic Partnerships and Legal Affairs.

1

exercise that trains the brain and strengthens mental muscles by targeting core mental skills such as attention, awareness, working memory and processing abilities." (Docket No. 7-2 (Declaration of Jean Castonguay).). Bates proposed that CogniSens—which had previously focused its NeuroTracker marketing and sales efforts on athletics, military special forces, and medical applications—consider targeting the United States public education sector. Bates offered his services to that end, and on October 14, 2012, Castonguay and Bates met in Washington, D.C. to discuss details of Bates's proposal. Bates did not intimate that he intended to direct his efforts specifically toward Tennessee school systems, and Castonguay communicated that he wanted to pursue sales to school systems throughout the United States. Following the meeting, CogniSens drafted a contract to formalize an arrangement with Bates as an independent contractor with the official title of Executive Director Business Development, US Public Education Market. CogniSens sent Bates an unsigned offer letter dated November 1, 2012, directed to "Robert Bates, Nashville, Tennessee," which he signed and returned to CogniSens. Castonguay signed the contract at CogniSens' Montreal office on November 7, 2012.

Under the contract, Bates was paid on a sales commission basis, including a non-refundable $5,500 commission advance per month. Bates was also entitled to participate in a company incentive program that entitled him to 45,000 shares of CogniSens stock. Bates reported directly to Castonguay and did not have authority to accept orders in CogniSens' name. The contract outlines Bates's business duties in the "Activity" section, which reads as follows:

> You will devote your full time to business development and the promotion and sale of CogniSens products in the Target Markets, through the management of our direct sales efforts and our sales efforts through referral agents.

(*Id*. at 12–13.)

Upon acceptance of the contract, Bates began working to commercialize the NeuroTracker technology. Based on his experience in early stage educational technology products, Bates recognized that the NeuroTracker did not meet "evidence of effectiveness" standards that are crucial to funding justifications for education technology in American public schools. "Evidence of effectiveness" standards evaluate whether a product has been sufficiently tested and vetted for students. As a result, Bates sought to develop a record of proper testing. He used his contacts in the Tennessee education community to secure a contract for CogniSens with the Tennessee Principals Association ("TPA"), which helped initiate and accelerate NeuroTracker trial programs in several Tennessee state school systems. Bates's initial pitch to the TPA Board of Directors was made in Murfreesboro, Tennessee, and trials were implemented at schools in Nashville, Whitwell, Greenville, and Kingsport. These trials took place over several months in 2013 and 2014, and Bates was onsite for each to "ensure implementation fidelity." (Docket No. 11 at 4 (Declaration of Robert Bates).) Bates "secured the school trials with the full endorsement, encouragement, and enthusiasm of [CogniSens] and Mr. Castonguay." (*Id.*) In at least one contractual agreement related to the trials, CogniSens agreed to be governed by Tennessee law. (See Docket No. 11-2 at 2 (Addendum to License Agreement between CogniSens and Kingport City School System) ("This Agreement shall be governed by the laws of the State of Tennessee.").) In order to assist with the trials, CogniSens uploaded software to a cloud server operated in Canada, which Bates accessed remotely via his computer in Tennessee. CogniSens had Bates transmit data derived from the Tennessee trials to it in Montreal, sometimes requesting that Bates expedite the deliveries via courier. It used the data in demonstrations to investors and potential investors and used the data and testimonials generated from the trials on its website to promote the NeuroTracker.

Bates had frequent contact with CogniSens during his employment, primarily from his home or other worksites in Tennessee. These include 160 emails from Castonguay and 250 emails from CogniSens' marketing director in 2013, 550 emails from Castonguay in 2014, and "hundreds, if not thousands of phone calls and Skype Meetings" with CogniSens employees over those two years. (*Id*. at 5.) CogniSens representatives twice appeared in Tennessee at Bates's request to attend conferences in Nashville. Bates also engaged in work outside of Tennessee. He met with the U.S. Elementary School Principals Association in Washington, D.C., and attended various other trade shows and conferences throughout the country. Ultimately, Bates's efforts did not translate to success in sales. He made only two sales for a total revenue of approximately $6,500. One of the sales, for $1,500, was to a school in Whitwell, Tennessee. The other sale, for approximately $5,000, was to an out-of-state customer. In October 2014, CogniSens terminated Bates, citing his failure to meet performance expectations. In April 2018, Bates brought suit in Tennessee Chancery Court, alleging breach of contract for nonpayment and failure to deliver stock options. (Docket No. 1-2.) The following month, CogniSens removed the case to this court. (Docket No. 1.) CogniSens now seeks to dismiss the case on the grounds that this court lacks personal jurisdiction over it.[3]

## **LEGAL STANDARD**

In considering a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), a court has three options. It may (1) rule on the motion on the basis of the affidavits and materials submitted by the parties, (2) permit discovery in aid of the motion, or (3) conduct an evidentiary hearing on the merits of the motion. *See Dean v. Motel 6 Operating L.P*., 134 F.3d 1269, 1272

---

[3] CogniSens also moves to dismiss for improper venue pursuant to Fed. R. Civ. P. 12(b)(3), but its sole argument is that venue in this court is improper because the court lacks personal jurisdiction over CogniSens.

4

(6th Cir. 1998). It is in the court's discretion, based on the circumstances of the case, which path to choose. *Id*. In any proceeding, however, the party asserting jurisdiction has the burden of proof. *See Bird v. Parsons*, 289 F.3d 865, 871 (6th Cir. 2002). "Additionally, in the face of a properly supported motion for dismissal, the plaintiff may not stand on his pleadings but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction." *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991).

When a court rules on a motion to dismiss for lack of personal jurisdiction based upon the affidavits or other preliminary materials, the party asserting jurisdiction need only make a *prima facie* showing of jurisdiction to defeat the motion. *Theunissen*, 935 F.2d at 1458. In examining whether the party asserting jurisdiction has made this *prima facie* showing, the court is to construe the facts presented in the light most favorable to that party, and the court does not weigh or consider the conflicting facts presented by the other side. *Bird*, 289 F.3d at 871; *see also Estate of Thomson ex rel. Estate of Rakestraw v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 360-61 (6th Cir. 2008) (referring to the plaintiff's burden in this context as "relatively slight").

Under Fed. R. Civ. P. 12(b)(3), a defendant may move to dismiss a case for improper venue. On such a motion, it is the plaintiff's burden to show that venue is proper. *Gone to the Beach, LLC v. Choicepoint Servs.*, 434 F. Supp. 2d 534, 537–38 (W.D. Tenn. 2006). If the district court finds that the case is "in the wrong division or district" the court "shall dismiss" the case, or, "if it be in the interest of justice," the court may transfer the case "to any district or division in which it could have been brought." 28 U.S.C. § 1406(a).

## **ANALYSIS**

It is well established that federal courts follow state law to determine the bounds of personal jurisdiction over a defendant. "In a diversity action, the law of the forum state dictates whether

5

personal jurisdiction exists, subject to constitutional limitations." *Intera Corp. v. Henderson*, 428 F.3d 605, 615 (6th Cir. 2005). Tennessee statutes authorize the exercise of jurisdiction over nonresident defendants on "[a]ny basis not inconsistent with the constitution of this state or of the United States." Tenn. Code Ann. §§ 20–2–214(a), 20–2–225(2). These statutes have been construed to expand the jurisdictional reach of Tennessee courts "as far as constitutionally permissible." *First Cmty. Bank, N.A. v. First Tenn. Bank, N.A.*, 489 S.W.3d 369, 384 (Tenn. 2015), *cert. denied sub nom. Fitch Ratings, Inc. v. First Cmty. Bank, N.A.*, 136 S. Ct. 2511 (2016). The question here is whether this court's exercise of jurisdiction over CogniSens would "comport[ ] with the limits imposed by federal due process." *Daimler AG v. Bauman*, 134 S. Ct. 746, 753 (2014).

The Supreme Court has identified "general" jurisdiction and "specific" jurisdiction as distinct bases for personal jurisdiction. The assertion of specific jurisdiction "depends on an affiliatio[n] between the forum and the underlying controversy," such as an "activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 918 (2011) (internal quotation marks and citations omitted). "For specific jurisdiction to exist in a diversity case, two factors must be satisfied: the forum state long-arm statute, and constitutional due process." *Miller v. AXA Winterthur Ins. Co.*, 694 F.3d 675, 679 (6th Cir. 2012). The parties agree that the motion turns on whether the court has specific personal jurisdiction over CogniSens, that the federal and Tennessee minimum contacts analysis merge into a federal due process analysis because Tennessee's long-arm statute reaches to federal constitutional limits, and that the court must therefore apply the three-part *Mohasco* test set forth by the Sixth Circuit. *See S. Mach. Co. v. Mohasco Indus., Inc.*,

401 F.2d 374, 381 (6th Cir. 1968). The *Mohasco* test has three elements, all of which must be met for specific personal jurisdiction to be found:

> (1) "[T]he defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state."
>
> (2) "[T]he cause of action must arise from the defendant's activities" in or contacts with the forum state.
>
> (3) "[T]he acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of personal jurisdiction reasonable."

*Id*.

### i. CogniSens purposefully availed itself of the privilege of acting in Tennessee.

Although all three elements of the *Mohasco* test must be satisfied, it is the "purposeful availment" element of the test that is the *sine qua non* of specific personal jurisdiction. *Id*. at 381–82. As described in *Bridgeport Music, Inc. v. Still N The Water Publ'g*, 327 F.3d 472 (6th Cir. 2003):

> Purposeful availment is something akin to a deliberate undertaking to do or cause an act or thing to be done in the forum state or conduct which can be properly regarded as a prime generating cause of the effects resulting in the forum state, something more than a passive availment of the forum state's opportunities. The purposeful availment requirement is satisfied when the defendant's conduct and connection with the forum are such that he should reasonably anticipate being haled into court there. The purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person. The emphasis in the purposeful availment inquiry is whether the defendant has engaged in some overt actions connecting the defendant with the forum state. If a plaintiff can demonstrate purposeful availment, the absence of physical contacts with the forum state will not defeat personal jurisdiction over a non-resident defendant.

*Id*. at 479–80. Personal jurisdiction requires a forum-by-forum analysis. *J. McIntyre Mach. v. Nicastro*, 564 U.S. 873, 884 (2011). "The question is whether a defendant has followed a course of conduct directed at the society or economy within the jurisdiction of a given sovereign." *Id*.

In analyzing purposeful availment in a contract dispute, courts should consider "prior negotiations and contemplated future consequences, along with the terms of the contract and [the] parties' actual course of dealing." *Burger King v. Rudzewicz*, 471 U.S. 462, 479 (1985). CogniSens argues that all of these factors militate against a finding of purposeful availment. The prior negotiations and terms of the contract indeed favor CogniSens: Bates reached out, unsolicited, to CogniSens in Montreal; the parties met to negotiate the contract in Washington D.C.; the contract lists Bates's position as "Executive Director Business Development, US public education market" and does not specify that any duties under the contract need be fulfilled in Tennessee. (Docket No. 7-2 at 11.) The contemplated future consequences are less clear. Bates did not explicitly state during his initial outreach phone call or at the Washington, D.C. meeting that he planned to focus his efforts in Tennessee, and the parties understood that Bates would develop NeuroTracker sales nationwide. But the contract offer is directed to "Robert Bates, Nashville, Tennessee," and was sent to Bates's Tennessee home, where he signed it. (*Id*.) Even if the parties contemplated that a significant portion of Bates's work under the contract would occur outside of Tennessee, CogniSens knew that Bates's operations would be based in Tennessee and thus had reason to believe that he would pursue sales there.

In any event, these factors are outweighed by the parties' actual course of dealing, which strongly favors Bates. Bates points first to his work on the "evidence of effectiveness" trials. Over the course of two years, Bates used his contacts in the Tennessee education community to secure a contract with TPA, which led to trials overseen by Bates in four Tennessee school systems. Bates

"secured the school trials with the full endorsement, encouragement, and enthusiasm of [CogniSens] and Mr. Castonguay." (Docket No. 12 at 8.) CogniSens assisted in Bates's efforts by uploading software to a cloud server, which Bates accessed remotely via his computer in Tennessee. CogniSens requested that Bates expedite via courier data derived from the Tennessee trials so that CogniSens could use the data in demonstrations to investors and potential investors. CogniSens' contacts were not random, fortuitous, or attenuated, but rather amounted to a course of economic conduct directed at Tennessee: Bates undertook the trials on behalf of CogniSens, and CogniSens endorsed the trials, took measures to assist with them, and requested the results be sent from Tennessee to be used by CogniSens.

CogniSens argues that Bates did not undertake the trials on its behalf but, instead, acted unilaterally in arranging and overseeing them. First, CogniSens claims that Bates acted unilaterally because it did not direct or instruct him to perform feasibility studies in Tennessee. But Bates's job duties under his employment agreement are defined as "business development and the promotion of sale of CogniSens products." (Docket No 7-2 at 12–13.) As a salesman with thirty years of experience in the field, Bates believed that proving evidence of effectiveness was a necessary prerequisite to successfully selling the NueroTracker in the U.S. public education market. CogniSens acknowledges that it hired him "to commercialize" the NeuroTracker (Docket No 7-1 at 1), and it endorsed and encouraged his efforts with the trials, including by uploading software to a server that Bates accessed in Tennessee. This is distinguishable from the "unilateral activity" in *Helicopteros v. Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984), where the Supreme Court held that a Colombian company was not subject to jurisdiction in Texas on the ground that it had accepted checks drawn on a Texas bank from a Texan plaintiff. The Court noted that there was no negotiation or interaction whatsoever between the parties with regard to the

location of the bank from which the checks would be drawn and that, therefore, the activity was unilateral. Although CogniSens did not direct Bates to perform the studies in Tennessee, it encouraged and endorsed the studies and took measures to assist them.

CogniSens next argues that the activity was unilateral because Bates's compensation was commission-based, derived only from sales, and that the company did not derive any profit in Tennessee directly from the trials. But CogniSens acknowledges that "Bates's obligation under the [c]ontract was to develop business for CogniSens," (Docket No. 17 at 2), and the trials were instituted with the eventual goal of developing business that would lead to profit for CogniSens. Moreover, in addition to sales commissions, Bates's contract also entitled him to stock options that were not directly tied to sales. The activity was therefore not unilateral on the part of Bates.

Moreover, the trials are not the only contacts alleged by Bates that are relevant to the jurisdictional analysis. Bates had frequent contact with CogniSens in Tennessee during his employment, including over 400 emails in 2013, 550 emails in 2014, and "hundreds, if not thousands of phone calls and Skype Meetings" with CogniSens employees over those two years. (*Id.* at 5.) CogniSens representatives twice appeared in Tennessee at Bates's request to attend conferences. Bates made a sale on CogniSens' behalf to a school in Tennessee. CogniSens argues that each of these collective contacts—the communications, the appearances, and the sale—are not enough, individually, to constitute purposeful availment. Taking each contact alone, CogniSens may be correct. But viewing all of these contacts together, in addition to the evidence of effectiveness trials, it is apparent that CogniSens engaged in overt actions connecting it to Tennessee.

This case is plainly distinguishable from *Calphalon Corp. v. Rowlette*, 228 F.3d 718 (6th Cir. 2000), upon which CogniSens relies heavily. In *Calphalon*, the defendant corporation served

10

as the exclusive representative promoting sales in four states on behalf of Calphalon, an Ohio-based cookware manufacturer. The defendant's four-state territory did not include Ohio but, after a contract dispute arose, Calphalon nonetheless sued the defendant in an Ohio district court. The Sixth Circuit found jurisdiction lacking because the defendant was not working for Calphalon in Ohio. *See id.* at 723 ("[Defendant]'s performance of the agreement was not focused on exploiting any market for cookware in the state of Ohio."). Bates worked to exploit the Tennessee market on CogniSens' behalf and with CogniSens' endorsement and assistance. The court finds that CogniSens purposefully availed itself of the benefits and protections of the laws of Tennessee.

### ii. The dispute arises from CogniSens' contacts with Tennessee.

"If a defendant's contacts with the forum state are related to the operative facts of the controversy, then an action will be deemed to have arisen from those contacts." *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1267 (6th Cir. 1996). The "arising from" prong is a "lenient standard." *Bird*, 289 at 875. The Sixth Circuit's treatment of this prong is not a model of clarity. *See Beydoun v. Wataniya Restaurants Holding, Q.S.C.*, 768 F.3d 499, 506–07 (6th Cir. 2014) ("Not all of our opinions treat this analysis the same . . . . In all cases, however, the elements required to establish personal jurisdiction remain the same—some cases simply address them at different levels of analysis."). The Sixth Circuit has explained that "the cause of action must . . . have a substantial connection with the defendant's in-state activities." *Dean*, 134 F.3d at 1275. The "arising from" prong is met "when the operative facts of the controversy arise from the defendant's contacts with the state. Only when the operative facts of the controversy are not related to the defendant's contact with the state can it be said that the cause of action does not arise from that contact." *Calphalon Corp.*, 228 F.3d at 723–24. In determining whether contacts are related to the operative facts of the controversy, the Sixth Circuit applies a proximate causation standard. *See id.* at 508.

The Tennessee Court of Appeals recently held that a defendant's nonpayment in Tennessee for contractual services performed in Tennessee caused the plaintiff's breach of contract action for jurisdictional purposes. *See Advanced Sec. Servs. Evaluation & Training, LLC v. OHR Partners Ltd.*, No. M2017-00249-COA-R3-CV, 2018 WL 1391626, at *8 (Tenn. Ct. App. Mar. 20, 2018) ("[Plaintiff] did not receive the promised payment, and it seeks the remaining balance of $37,247.82 owed for its performance. . . .  Thus, the cause of action stems directly from [Defendant]'s contacts with Tennessee. . . .  The alleged lack of payment for [Plaintiff]'s services caused foreseeable injuries in this state, and [Defendant] could have reasonably foreseen being haled into a Tennessee court as a result."). The Court of Appeals' reasoning is persuasive. CogniSens had substantial contacts with the state of Tennessee, and this contractual dispute was proximately caused by those contacts. The dispute thus arises out of the contacts.

CogniSens cites several Sixth Circuit cases for the proposition that nonpayment in the forum state cannot alone satisfy the "arises out of" factor of the *Mohasco* test. But the *Calphalon* court specifically stated that the locus of nonpayment is not determinative when a defendant's breach has a substantial connection to the forum in question. *See Calphalon Corp.*, 228 F.3d at 724. The court explained:

> In [*Kerry Steel Inc. v. Paragon Industries, Inc*., 106 F.3d 147, 151 (6th Cir. 1997)], we found the "arising from" requirement was not satisfied because defendant's alleged breach by failure to pay the purchase price occurred out of state. However, if the actual breach does not arise from the very soil from which the action for breach grew, the exercise of jurisdiction may still be deemed reasonable if, according to the third prong of the [*Mohasco*] test, the consequences of the act or breach caused by the defendant have a substantial enough connection with the forum state. In [*LAK, Inc. v. Deer Creek Enterprises*, 885 F.2d 1293, 1303 (6th Cir. 1989)], we noted that "if the contract had borne a more substantial relationship to Michigan [the forum state], it would not have been necessary for [the alleged tortious conduct] actually to have [occurred] in Michigan."

*Id.* (internal quotation marks omitted). Although the court's muddling of the second and third *Mohasco* prongs is admittedly confusing, the upshot is clear: the second prong is satisfied when the facts giving rise to the dispute are substantially connected to the forum state. *See id.* ("In this case, the facts at issue did not occur in the forum state nor were the consequences of the breach substantially connected to the forum state. [Defendant]'s performance of the terms of the agreement and any earning of commissions occurred in the states of [Defendant]'s sales territory, not Ohio."). The facts at issue in this dispute occurred in Tennessee, and the consequences of CogniSens' alleged breach were felt here, where Bates performed under the terms of the agreement. Bates thus satisfies the lenient second *Mohasco* prong.

### iii. Jurisdiction over CogniSens in Tennessee is reasonable.

The third *Mohasco* requirement is that the defendant have a sufficiently substantial connection to the forum such that the exercise of jurisdiction is not unreasonable. Where the first two factors are satisfied, "an inference of reasonableness arises," and "only the unusual case will not meet this third [factor]." *Theunissen*, 935 F.2d at 1461. "In determining whether the exercise of jurisdiction is reasonable, the court should consider, among others, the following factors: (1) the burden on the defendant; (2) the interest of the forum state; (3) the plaintiff's interest in obtaining relief; and (4) other states' interest in securing the most efficient resolution of the policy." *Schneider v. Hardesty*, 669 F.3d 693, 703–04 (6th Cir. 2012)

This is not an unusual case. Although the court is sensitive to the unique burdens that foreign defendants can face when forced to litigate in this country, *see Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 114 (1987), CogniSens does not articulate why that burden weighs heavily here. It does not, for example, argue that it would be forced to litigate in a foreign language or that it would face unreasonable travel burdens. Courts have held that this factor does not

strongly tilt the analysis when the foreign defendant objecting to jurisdiction is Canadian. *See C.W. Downer & Co. v. Bioriginal Food & Science Corp.*, 771 F.3d 59, 69 (1st Cir. 2014) ("Bioriginal identifies no special burden imposed by requiring it to litigate across the Canada-United States border."). The other factors support a finding of jurisdiction. Tennessee "has an interest in ensuring that its residents have adequate recourse for harms inflicted by nonresidents." *Schneider*, 669 F.3d at 704. Requiring Bates, an individual without corporate resources at his disposal, to litigate this dispute in another country would impose a substantial burden on him. And there is no interest of another state countervailing against jurisdiction here. The court thus finds that jurisdiction is reasonable. Because the three *Mohasco* factors support a finding of jurisdiction, this court has specific jurisdiction over CogniSens.

## **CONCLUSION**

For the foregoing reasons, CogniSens' Motion to Dismiss (Docket No. 7) is **DENIED**.

It is so **ORDERED**.

ENTER this 24th day of July 2018.

                                                                                        _____
                                                                                        ALETA A. TRAUGER
                                                                                        United States District Judge